**EXHIBIT "1"**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THOMAS ROY and &ast;
LISA ROY &ast;
&ast;
v. &ast;
&ast;
DELAWARE NORTH &ast;
COMPANIES, INC. – BOSTON &ast;
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFF'S COMPLAINT

### The Parties and Jurisdiction

1.    The plaintiff, Thomas Roy, is a resident of Hooksett, New Hampshire.

2.    The plaintiff, Lisa Roy, at all times material hereto is the lawful wife of Thomas Roy, and resides with him in Hooksett, New Hampshire.

3.    The defendant, Delaware North Companies, Inc. – Boston, upon information and belief, is an foreign corporation with a principal place of business in Boston and owns, operates and controls the entity formally referred to as the "Fleet Center." Moreover it is subject to the personal jurisdiction of this Court pursuant to the provisions of M.G. L. c. 223A, Section 3, the Massachusetts "Long-Arm Statute's" for:

(a)  transacting any business in the Commonwealth;

(c)  causing tortious injury by an act or omission in the commonwealth;

(e)  having an interest in, using or possessing real property in this commonwealth

4.      Jurisdiction is present pursuant to 28 USC § 1332 based on diversity of citizenship involving a matter in controversy that exceeds the value of $75,000.00.

5.      Venue is present pursuant to 28 USC § 1391(a)(2) in that a substantial part of the acts or omissions giving rise to this claim occurred within the jurisdictional district in which this case is filed.

## COUNT I
### (Negligence)

**(Thomas Roy v. Delaware North Companies, Inc. – Boston)**

6.      On or about March 10, 2004 the plaintiff was attending a Boston Celtics game at the Fleet Center.

7.      That after the game he was descending an escalator. Due to the negligence of the defendant, its agents, servants or employees in the maintenance and/or operation of said escalator the plaintiff was caused to fall, tumbling down said escalator.

8.      That as a proximate cause of said defendant's negligence the plaintiff was caused to suffer severe personal injuries of body and anguish of mind, incurred substantial expenses for medical care and attention, suffered a diminution of earning capacity and was otherwise injured all as will be shown at the trial of this matter.

WHEREFORE plaintiff demands judgment against defendant in the amount of $750,000.00.

COUNT III
(Loss of Consortium)

(Lisa Roy v. Delaware North Companies, Inc. – Boston)

9.    As a consequence of the injuries suffered by her husband, Thomas Roy, due to the defendant's negligence, the plaintiff, Lisa Roy, has suffered a loss of her husband's consortium.

WHEREFORE, the plaintiff, Lisa Roy, demands judgment against the defendant, Delaware North Companies, Inc. - Boston, in the sum of $100,000.00.

THE PLAINTIFFS DEMAND A TRIAL BY JURY ON EACH AND EVERY ISSUE
RAISED HEREIN.

Dated: May 24, 2005

The Plaintiffs, Thomas Roy and
Lisa Roy,
By their attorney,
Joseph G. Abromovitz, P.C.

_____
Joseph G. Abromovitz
BBO NO. 011420
858 Washington Street, 3rd Floor
Dedham, MA 02026
Phone: (781) 329-1080

**EXHIBIT "2"**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05cv11095NG

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

THOMAS ROY and          *
LISA ROY                *
v.                      *
                        *
DELAWARE NORTH          *
COMPANIES, INC. – BOSTON *
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFF, THOMAS ROY'S ANSWERS TO DEFENDANT'S FIRST SET OF INTERROGATORIES**

**INTERROGATORY NO. 1:**

State your name, date of birth, home address, occupation, employer and business address.

**ANSWER NO. 1:**

>    Thomas Joseph Roy
>    1465 Hooksett Road #73
>    Hooksett, NH 03106
>    Date of Birth: 5/28/57
>    Occupation: Self-employed
>    Kelly Construction Co., Inc.
>    750 East Industrial Park Drive
>    Manchester, NH 03106

**INTERROGATORY NO. 2:**

If you have ever been convicted of a felony within the past ten (10) years or a misdemeanor within the past five (5) years, please state the date of said conviction, the crime which you were convicted of, and the court in which the case was heard.

**ANSWER NO. 2:**

>    No.

## INTERROGATORY NO. 3:

Please identify in complete detail how the alleged incident occurred, stating fully what you saw and what you did, and what happened to you in the order in which the events took place, including what you were doing immediately prior and up to the occurrences of the alleged incident.

## ANSWER NO. 3:

My wife Lisa and I attended a Boston Celtics/LA Lakers game at the Fleet Center in Boston, Massachusetts. We were invited to watch the game from a private suit co-owned by Granite State Glass, a subcontractor of Kelly Construction. After the game ended we walked to the elevator which we had taken on the way up to the game. The elevator was not in service, so we proceeded to the escalators. My wife, Lisa, was in front of me and as she stepped toward the escalator her heel of her shoe got caught in the escalator and she started to fall. I reached for her and we both lost balance and fell down the escalator. This is all I remember until I awoke in the Intensive Care Unit at Beth Israel Deaconess. During the game we had food in the suite and I had approximately four beers. My wife had two rum and cokes from one of the concession stands.

## INTERROGATORY NO. 4:

Please state the date and time of alleged incident and describe as accurately as you are able the location where the incident took place, giving distances in feet and inches to clearly identifiable objects.

## ANSWER NO. 4:

The date of the accident was Wednesday, March 10, 2004, and the time of the accident was approximately 10:30 p.m. The escalator when the accident took place was

approximately 400 yards from the private suite and about 25 yards from the elevator

that was out of service.

## INTERROGATORY NO. 5:

State in full and complete detail all facts, and all acts or omissions to act of the
defendant, upon which you base your allegations in your complaint.

## ANSWER NO. 5:

I was told by a witness that I fell over my wife and tumbled down the entire

escalator to the bottom floor where I was unconscious. I was told that an employee of

the Fleet Center rushed down the escalator to shut it down. It is my opinion that the

escalator had defects that caused Lisa to have her heel catch in the threads. The elevator

we took to the suite was out of service after the game, as well.

I am advised by counsel that discovery is ongoing. Accordingly, I reserve the

right to supplement this response.

## INTERROGATORY NO. 6:

With respect to persons having knowledge of discoverable matters including parties
who witnessed, observed, or were present at, the incident alleged in your complaint,
please provide the following:

       (a)    their names and residential addresses;

       (b)    their occupation, employer and business address; and

       (c)    a complete description of the discoverable matter of which each
               person has knowledge.

## ANSWER NO. 6:

At the time of the incident there were many people leaving the game. Anyone

that witnessed the accident we personally did not know.

## INTERROGATORY NO. 7:

If you are working at the present time, please state the wages, salary or profit you are receiving from such work, and the name and address of your employer.

## ANSWER NO. 7:

At the time of the accident I was and am still employed by Kelly Construction

Co., Inc. I serve as the company's President and CEO. My salary at the time was

$2,400.00 per week with a bonus structure of approximately $75,000 per year.

## INTERROGATORY NO. 8:

If you have suffered financial loss as a result of the alleged incident, state in what amount, itemizing as far as possible doctors' bills, hospital expenses, and loss in wage, salary or business profit.

## ANSWER NO. 8:

Plaintiff will supplement.

## INTERROGATORY NO. 9:

If you anticipate future financial loss as a result of the alleged incident, state in what amount, itemizing as far as possible doctors' bills, hospital expenses, and loss of wage, salary or business profit.

## ANSWER NO. 9:

I am still in need of surgery on both of my shoulders for torn rotator cuffs. Due

to the death of my brother and business partner from cancer I have not had time to have

the surgery. I estimate approximately four weeks of additional lost time due to the

healing and rehabilitation process resulting from the surgeries. The lost wages and

additional financial losses will need to be evaluated once both surgeries are completed.

Accordingly, I reserve the right to supplement.

## INTERROGATORY NO. 10:

If you claim any personal injuries as a result of the incident alleged in your complaint, state:

(a)  in full and complete detail, a description of each of the injuries you received, including all marks, bruises and what part or parts of your body were affected;

(b)  in full and complete detail, a description of each of the injuries you believe or are informed are permanent;

(c)  if you received any medical treatment as a result of the alleged incident, please describe all such treatment in full and complete detail, giving the date each treatment was received;

(d)  if you received any treatment at a hospital or hospitals, please describe all such treatment in full and complete detail, giving places, dates and whether received as an in-patient or out-patient;

(e)  the name and address of each physician who treated you as a result of the alleged incident, giving the date(s) each physician treated you;

(f)  the dates between which you were confined to your home;

(g)  the dates between which you were confined to your bed;

(h)  the dates between which you were absent from work;

(i)  the wages, salary or profit you were receiving at the time of the alleged incident; and the name and address of your employer at that time;

(j)  in full and complete detail a description of any physical impairments, accidents, illnesses or diseases which you have had during the period from six years prior to the accident to date;

(k)  in full and complete detail, in what way and to what extent you are presently suffering from any of the injuries listed in your answer to interrogatory no. 9.

## ANSWER NO. 10:

(a)     I fractured my neck and have torn rotator cuffs in both shoulders. Plaintiff further refers the Defendant to the medical records produced in response to the Defendant's Request For Production of Documents, and in Plaintiff's Initial Disclosure.

(b)     The full residual effects of my injuries have yet to be determined. Plaintiff therefore, reserves the right to supplement. Plaintiff further refers the Defendant to his response to subpart (k) herein.

(c)     Please see my response to (a)

(d)     Please see my response to (a)

(e)     Dr. Lee Macey, Orthopedic Surgeon; Dr. Brian Claussen, my primary care physician. Please see my medical records.

(f)     3/15/05 through 7/5/05

(g)     N/A

(h)     3/15/05 through 7/5/05

(i)     See response to Question 7.

(j)     Had brain seizures during the summer of 2002. I was coaching an AAU baseball team and had a line drive baseball strike me in my left temple. Medical release of the incident can be made available at your request.

(k)     Constant pain in both shoulders with very limited ability to exercise, play sports or do daily chores. Still need medication to properly sleep in the evenings due to pain. Also minor arthritis is forming where my neck injury occurred.

**INTERROGATORY NO. 11:**

With respect to each expert witness you or your attorney expect to call at trial:

      (a)     please give the name and present address of each person;

      (b)     the subject matter on which each such expert is expected to testify;

      (c)     the substance of the facts and opinions to which each such expert is expected to testify;

      (d)     a summary of the grounds for each such opinion of each such witness.

**ANSWER NO. 11:**

Plaintiff is advised by counsel that a decision as to expert witnesses to be called at trial has yet to be made. When such a decision is made, Plaintiff will supplement accordingly.

**INTERROGATORY NO. 12:**

If you have ever received medical treatment for neck or back pain prior to the accident alleged in this case, please provide the following information:

      (a)     a complete description of every such treatment including when it was incurred, the nature, severity and extent of any symptoms experienced because of any such neck or back pain;

      (b)     the name and address of any person or entity against whom you have had a legal claim because of any such neck or back pain;

      (c)     the docket number and court where any lawsuit was ever filed concerning any such neck or back pain;

      (d)     the name, address and claim number of any insurer handling any claim you ever filed with respect to any such neck or back pain or injury;

      (e)     the name of every doctor, medical provider and/or hospital where you ever received treatment for any prior neck or back pain or injury and the dates of each such treatment.

**ANSWER NO. 12:**

There has been no prior back or neck injuries.

**INTERROGATORY NO. 13:**

State in full and complete detail all facts, and all acts or omissions to act of the defendant, upon which you base your allegations of negligence in your complaint.

**ANSWER NO. 13:**

Please refer to response to Interrogatory No. 5.

**INTERROGATORY NO. 14:**

If you claim any personal injuries as a result of the incident alleged in your complaint, state:

    (a)    in full and complete detail, a description of each of the injuries you received, including all marks, bruises and what part or parts of your body were affected;

    (b)    in full and complete detail, a description of each of the injuries you believe or are informed are permanent;

    (c)    if you received any medical treatment as a result of the alleged incident, please describe all such treatment in full and complete detail, giving the date each treatment was received;

**ANSWER NO. 14:**

Please see my response to Interrogatory No. 9 (a) (b) and (k).

**INTERROGATORY NO. 15:**

Describe in detail the product that you allege caused your injury, including but not limiting yourself in your answer to:

    (a)    the kind or type of product;

    (b)    the manufacturer's name;

    (c)    the brand name;

(d)    the model;

(e)    the serial number.

## ANSWER NO. 15:

(a)    escalator system

(b)    Unknown

(c)    Unknown

(d)    Unknown

(e)    Unknown

## INTERROGATORY NO. 16:

State all facts and evidence upon which the plaintiff relies on in alleging that the defendant was negligent in the maintenance and/or operation of the subject escalator.

## ANSWER NO. 16:

Plaintiff is advised by counsel that discovery is ongoing. Accordingly, plaintiff reserves the right to supplement.

## INTERROGATORY NO. 17:

Please state, giving all relevant facts available to you, the grounds for your allegations that the defendant breached any warranty resulting in injuries to you.

## ANSWER NO. 17:

No such allegations were made in the Plaintiff's Complaint.

## INTERROGATORY NO. 43:

If you have ever been convicted of a felony within the past ten (10) years or a misdemeanor within the past (5) years, please state the date of said conviction, the crime which you were convicted of, and the court in which the case was heard.

## ANSWER NO. 43:

Plaintiff objects to this interrogatory since it is identical to Interrogatory No. 2.

## INTERROGATORY NO. 44:

Describe in detail the product that you allege caused your injury, including but not limiting yourself in your answer to:

    (a)    the kind or type of product;

    (b)    the manufacturer's name;

    (c)    the brand name;

    (d)    the model;

    (e)    the serial number.

## ANSWER NO. 44:

Unknown at this point. Plaintiff is advised by counsel that discovery is ongoing, and accordingly reserves the right to supplement this response.

## INTERROGATORY NO. 45:

State all facts and evidence upon which the plaintiff relies on in alleging that the defendant was negligent in the design and manufacture of the subject tarp.

## ANSWER NO. 45:

Plaintiff objects to this interrogatory as nonsensical. Plaintiff did not allege negligent design and manufacturer of a "tarp."

## INTERROGATORY NO. 46:

Please state, giving all relevant facts available to you, the grounds for your allegations that the defendant breach any warranty resulting in injuries to you.

**ANSWER NO. 46:**

Plaintiff did not allege a breach of warranty in his complaint.

**INTERROGATORY NO. 47:**

If you allege that the defendant violated or failed to comply with any federal or state government regulation or statue, any industry standard or regulation, or any standard established by any trade group or independent testing association, which violation or failure to comply was a cause or contributed to your injuries, please state as to each:

(a)    the full citation of said standard, law or regulation;

(b)    the facts upon which you base your allegation that said standard, law or regulation was violated.

**ANSWER NO. 47:**

Unknown at this time.  Plaintiff is advised by counsel that discovery is ongoing.

Plaintiff reserves the right to supplement.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THE      DAY OF, NOVEMBER, 2005**

Thomas Roy

As to objections:
JOSEPH G. ABROMOVITZ, P.C.

Joseph G. Abromovitz
BBO#: 011420
858 Washington Street
Third Floor
Dedham, MA 02026
Phone: (781) 329-1080

## CERTIFICATE OF SERVICE

I, Joseph G. Abromovitz, counsel for the plaintiff, hereby certify that on this day

of November, 2005 I served a copy of the within document via postage prepaid mail to

the following counsel of record:

Lawrence F. Boyle, Esq.
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA. 02210

Joseph G. Abromovitz

**EXHIBIT "3"**

ORIGINAL

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05CV11095NG
Vol. I, Pg. 1-107

THOMAS ROY and LISA ROY,                    )
                                            )
        Plaintiffs,                         )
                                            )
        -vs-                                )
                                            )
DELAWARE NORTH COMPANIES, INC.,             )
                                            )
        Defendant                           )
                                            )

The **DEPOSITION OF LISA ROY**, taken on behalf of

the Defendant, pursuant to the Massachusetts Rules

of Civil Procedure before Mary K. Corcoran, a

Professional Shorthand Reporter and Notary Public in

and for the Commonwealth of Massachusetts, at the

offices of MORRISON MAHONEY LLP, 250 Summer Street,

Boston, MA, on Monday, November 28, 2005, commencing

at 10:13 a.m.

**ELLEN M. FRITCH & ASSOCIATES**
**373 Silver Street**
**South Boston, MA 02127**
**(617) 269-5448**

22

| | | |
|---|---|---|
| 1 | A. | The amount of rain we had, the amount of |
| 2 | | granite we found that we had to blast. |
| 3 | Q. | Did you hire somebody to design the house? |
| 4 | A. | I designed the house.  We hired an architect. |
| 5 | Q. | And then Tom handled the retention of |
| 6 | | subcontractors to do the work? |
| 7 | A. | Yes. |
| 8 | Q. | Do you recall the date of the accident in this |
| 9 | | case? |
| 10 | A. | It was March 14. |
| 11 | Q. | By the way, you said you designed your house. |
| 12 | | Do you have some specialized knowledge with |
| 13 | | respect to design? |
| 14 | A. | No. |
| 15 | Q. | Where did the accident involving your |
| 16 | | husband's fall happen? |
| 17 | A. | At the FleetCenter. |
| 18 | Q. | What time did you arrive at the FleetCenter on |
| 19 | | this date? |
| 20 | A. | It was just before the game. |
| 21 | Q. | Well, what game were you going to see? |
| 22 | A. | A Celtics' game. |
| 23 | Q. | Did you go with anybody? |
| 24 | A. | With Tom. |

DEPOSITION OF LISA ROY

23

| | | |
|---|---|---|
| 1 | Q. | Just the two of you? |
| 2 | A. | Yes. |
| 3 | Q. | How did you get tickets? |
| 4 | A. | Through a subcontractor Tom works with. |
| 5 | Q. | And where were the tickets located; where were |
| 6 | | the seats? |
| 7 | A. | In one of the suites. |
| 8 | Q. | Do you know whereabouts that suite was |
| 9 | | located? |
| 10 | A. | I don't remember the number. |
| 11 | Q. | Had you ever been to the FleetCenter before? |
| 12 | A. | Yes. |
| 13 | Q. | How many times? |
| 14 | A. | Including when it was the Garden? |
| 15 | Q. | Yes -- well, just stick with the new building. |
| 16 | A. | Okay.  Maybe about two or three times. |
| 17 | Q. | Was it for what type of event? |
| 18 | A. | Celtics. |
| 19 | Q. | Is that a team that you were a fan of? |
| 20 | A. | Yes. |
| 21 | Q. | What about Tom? |
| 22 | A. | Not as much as me. |
| 23 | Q. | And are you a Bruins' fan? |
| 24 | A. | No. |

DEPOSITION OF LISA ROY

24

1    Q.    So, the games you had gone to at the

2          FleetCenter were Celtics' games?

3    A.    Yes.

4    Q.    How would you get tickets in the past?

5    A.    Tom bought them for me for Christmas.

6    Q.    So, you've never been a season ticket-holder?

7    A.    No.

8    Q.    How about Tom?

9    A.    No.

10   Q.    How far is it a drive when you were living in

11         Hookset to get to the FleetCenter?

12   A.    Depending on traffic, around an hour.

13   Q.    And you say you got there just before the game

14         started?

15   A.    Yes.

16   Q.    What time would that have been?

17   A.    Either 7:00 or 7:30.

18   Q.    Where did you park?

19   A.    We parked at the Marriott Copley.

20   Q.    Why did you park there?

21   A.    We were staying there for the night.

22   Q.    How did you get to the FleetCenter from the

23         Copley?

24   A.    Taxi.

DEPOSITION OF LISA ROY

25

1    Q.    Was this any particular special event this

2          night?

3    A.    No.

4    Q.    And how many tickets had you been given from

5          this subcontractor?

6    A.    Two.

7    Q.    Had you ever been to a suite at the

8          FleetCenter before?

9    A.    No.

10   Q.    Had you ever been to the so-called premium

11         level seating at the FleetCenter?

12   A.    Is that on the floor?

13   Q.    Premium level being the same level as that

14         suite?

15   A.    No.

16   Q.    Where had you sat when you had previously

17         attended Celtics' games at the FleetCenter?

18   A.    On the floor.

19   Q.    Do you know what day of the week this was?

20   A.    I don't recall.

21   Q.    Do you know if it was a weekday versus a

22         weekend?

23   A.    Weekday.

24   Q.    Do you know who the opponent the Celtics were

DEPOSITION OF LISA ROY

26

1          playing?

2     A.    The Lakers.

3     Q.    What had you -- strike that.  Had you had any

4          supper that night, dinner?

5     A.    Before entering the suite?

6     Q.    No, before you left for the Celtics' game.

7     A.    Yes.

8     Q.    And what time did you have dinner?

9     A.    I had it in the suite.

10    Q.    So, what did you do that day; do you recall?

11    A.    I don't recall.

12    Q.    This would have been a school night, a school

13          day for the children?

14    A.    Yes.

15    Q.    And to get to the Fleet either at 7:00 or

16          7:30, depending upon when the game started,

17          you would have been rolling out of your

18          driveway sometime at 6:00, 6:30 if it took an

19          hour; correct?

20    A.    Yes.

21    Q.    Do you know what time your husband got home

22          from work that day?

23    A.    I don't remember.

24    Q.    So, you had dinner that night at the suite?

DEPOSITION OF LISA ROY

27

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | What was the dinner? |
| 3 | A. | I had chowder.  I had shrimp.  I don't |
| 4 | | remember what else they had. |
| 5 | Q. | Are these hors d'oeuvres as opposed to a |
| 6 | | formal meal? |
| 7 | A. | They had a sandwich platter.  They had tuna or |
| 8 | | ham. |
| 9 | Q. | So, in addition to the chowder and the shrimp, |
| 10 | | you had a sandwich? |
| 11 | A. | A sandwich. |
| 12 | Q. | How did you order the food? |
| 13 | A. | We didn't.  The people in the suite did.  The |
| 14 | | food was there when we got there. |
| 15 | Q. | Did you intend to meet anybody that you knew |
| 16 | | when you went to the suite? |
| 17 | A. | Yes, one of the suite owners. |
| 18 | Q. | And was that the person that provided you with |
| 19 | | the tickets? |
| 20 | A. | Yes. |
| 21 | Q. | What's his name? |
| 22 | A. | Bill Marcotte. |
| 23 | Q. | Had you ever met him before this night? |
| 24 | A. | Yes. |

DEPOSITION OF LISA ROY

44

```
 1              somewhere in the corridor?
 2   A.    Yes.
 3   Q.    It wasn't a formal bar at one end of the
 4         premium level?
 5   A.    I don't remember.
 6   Q.    Who bought the rum and Coke?
 7   A.    My husband.
 8   Q.    How did he pay for it?
 9   A.    I don't know.  I wasn't with him.
10   Q.    When you arrived at the Fleet -- strike that.
11         When you arrived at the suite, were there
12         alcoholic beverages available there?
13   A.    Yes.
14   Q.    What was available?
15   A.    Beer and wine.
16   Q.    And you weren't a beer or wine drinker?
17   A.    I'll have an occasional glass of wine but not
18         beer.
19   Q.    And your husband -- let me strike that.
20         Before you arrived, did you realize that they
21         did not serve hard liquor in the suites?
22   A.    No.
23   Q.    And that's why your husband went out and got
24         you a drink from a vendor?
```

DEPOSITION OF LISA ROY

45

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | How many rum and Cokes did you have that |
| 3 | | night? |
| 4 | A. | About three. |
| 5 | Q. | When did you have your first one? |
| 6 | A. | I don't remember. |
| 7 | Q. | Soon after arrival? |
| 8 | A. | Within a half an hour. |
| 9 | Q. | And when did you have your last one? |
| 10 | A. | I don't remember. |
| 11 | Q. | Did you have anything else to drink? |
| 12 | A. | Pepsi or Coke. |
| 13 | Q. | When did you drink the Pepsi? |
| 14 | A. | When? |
| 15 | Q. | Yes. |
| 16 | A. | While I was in the suite. |
| 17 | Q. | Was it when you were consuming food in the |
| 18 | | beginning -- strike that.  Was it when you |
| 19 | | were consuming food that you had the Pepsi? |
| 20 | A. | Yes. |
| 21 | Q. | Do you recall the sequence of drinks that you |
| 22 | | had when you had what?  You said three rum and |
| 23 | | Cokes, and was it one Pepsi or more than one? |
| 24 | A. | More than one. |

DEPOSITION OF LISA ROY

46

1    Q.    How many, do you know?

2    A.    I don't remember.

3    Q.    Do you know if it was more than two?

4    A.    I can't tell you.

5    Q.    Do you know if you had any wine?

6    A.    No.

7    Q.    Do you know what was your last drink, alcohol

8          or non-alcohol?

9    A.    Probably non-alcohol.

10   Q.    Is that a guess?

11   A.    That's a guess.

12   Q.    Did you have any coffee?

13   A.    No.

14   Q.    Did you have any other types of liquid

15         refreshments other than a certain number of

16         Pepsis or Cokes and three rum and Cokes?

17   A.    No.

18   Q.    Could it have been more than three rum and

19         Cokes?

20   A.    I don't remember.

21   Q.    Now, you told me what type of food you had.

22         Could you help us with the amount of food that

23         you consumed?

24   A.    I had a bowl of chowder, a sandwich.

DEPOSITION OF LISA ROY

51

| 1 | Q. | How did he sound? |
|---|---|---|
| 2 | A. | Fine. |
| 3 | Q. | Did you have occasion to look at his eyes? |
| 4 | A. | When we were talking. |
| 5 | Q. | Did you notice anything about them that |
| 6 | | appeared to be unusual? |
| 7 | A. | No. |
| 8 | Q. | When you left the booth, do you feel that you |
| 9 | | were under the influence of alcohol? |
| 10 | | MS. MORELLO:   Objection. |
| 11 | A. | No. |
| 12 | Q. | Were you still feeling happy at the time that |
| 13 | | you left? |
| 14 | A. | Yes. |
| 15 | Q. | Do you know the size of the drinks that you |
| 16 | | consumed? |
| 17 | A. | About this size here (indicating). |
| 18 | Q. | That's an eight-ounce coffee cup -- ten-ounce |
| 19 | | coffee cup, excuse me; correct? |
| 20 | A. | Yes.  I'm not sure if it was ten ounces, but |
| 21 | | it was about the size of this. |
| 22 | Q. | And how was the drink mixed? |
| 23 | A. | I don't know. |
| 24 | Q. | Would they give you a strong dose of alcohol |

DEPOSITION OF LISA ROY

61

| | | |
|---|---|---|
| 1 | | husband, or Mr. or Mrs. Marcotte, carrying |
| 2 | | anything? |
| 3 | A. | I don't remember. |
| 4 | Q. | Did you see anybody carrying a beer? |
| 5 | A. | I don't remember. |
| 6 | Q. | Did you see anybody that you thought was a |
| 7 | | Fleet employee at the top of the escalator? |
| 8 | A. | I don't remember. |
| 9 | Q. | Did you hear anybody say you can't take beer |
| 10 | | on the escalator or out of the premium level? |
| 11 | A. | No. |
| 12 | Q. | Were you carrying your purse at the time of |
| 13 | | the incident? |
| 14 | A. | Yes. |
| 15 | Q. | Were you wearing your jacket or do you |
| 16 | | remember? |
| 17 | A. | I don't remember. |
| 18 | Q. | Do you know if your husband was wearing his |
| 19 | | coat or carrying his coat? |
| 20 | A. | I don't remember. |
| 21 | Q. | Do you know if you had ever been on this |
| 22 | | escalator before at any time in your life? |
| 23 | A. | I don't remember. |
| 24 | Q. | How did the accident happen? |

62

1    A.   My heel got caught when I stepped onto the

2        escalator.

3    Q.   Got caught on what?

4    A.   I wasn't looking down.  I believe the treads.

5    Q.   Well, how do you know it was the treads?

6    A.   I don't know.  I wasn't looking down.

7    Q.   How could the treads have caught this heel?

8             MS. MORELLO:  Objection.

9    Q.   I'm talking about --

10           THE WITNESS:  Do I answer?

11           MS. MORELLO:  Yes, unless I tell you

12    not to answer.

13           THE WITNESS:  Okay.

14    A.   I don't know.

15    Q.   Did you notice anything unusual about the

16        appearance of the treads on the escalator?

17    A.   No.

18    Q.   Were you holding onto the rubber railing as

19        you were going down the escalator?

20    A.   Yes.

21    Q.   With what hand?

22    A.   My right.

23    Q.   Are you right-handed?

24    A.   Yes.

71

| | | |
|---|---|---|
| 1 | A. | No. |
| 2 | Q. | So, you say the sensation you feel is your |
| 3 | | foot wouldn't move forward? |
| 4 | A. | Right. |
| 5 | Q. | You say catch on something.  You don't know |
| 6 | | what part of your shoe caught on what part of |
| 7 | | the escalator; correct? |
| 8 | A. | Correct. |
| 9 | Q. | You don't know if it was the toe, the heel, |
| 10 | | the side of the shoe; you just feel your shoe |
| 11 | | was caught? |
| 12 | A. | Yes. |
| 13 | Q. | You never looked down to see what it was |
| 14 | | caught on? |
| 15 | A. | No. |
| 16 | Q. | Did you see any foreign substance on the |
| 17 | | escalator like a banana peel or anything like |
| 18 | | that? |
| 19 | A. | No. |
| 20 | Q. | Any wetness on the escalator? |
| 21 | A. | No. |
| 22 | Q. | Did you feel any sudden unexpected movement on |
| 23 | | the escalator when you say your foot got |
| 24 | | "caught"? |

72

1   A.   No.

2   Q.   Did you hear any grinding of metal or

3        anything?

4   A.   No.

5   Q.   Then what happened next?

6   A.   Then I fell, and that's all I remember until I

7        was down at the bottom of the escalator.

8   Q.   You fell all the way down the bottom?

9   A.   Yes.

10  Q.   Why couldn't you stop your fall by holding

11       onto the right railing?

12            MS. MORELLO:   Objection.

13  A.   I don't know.

14  Q.   Where was your left foot when you say your

15       right foot got caught?

16  A.   I don't remember.

17  Q.   Do you remember getting on the escalator and

18       turning around when some FleetCenter employee

19       said you can't take a beer on the escalator;

20       do you remember that?

21  A.   No.

22  Q.   That didn't happen; no one said that?

23  A.   Not that I remember.

24  Q.   Why did your husband fall?

81

1         original photographs of Ms. Roy's injury?  If

2         you bear with me a minute, I'll get some

3         photocopies.

4                (Short break taken.)

5  Q.   These shoes marked as Exhibit 3, as I measure

6         across, you can correct me, it's approximately

7         two and a quarter inches; correct?

8  A.   Correct.

9  Q.   And the height on the back is about two and

10        three-quarters inches; correct?

11  A.   Correct.

12  Q.   How do these -- are you an eight and a half

13        medium; that's the size of these shoes?

14  A.   Yes.

15  Q.   How do these shoes fit you?

16  A.   Good.

17  Q.   What were you wearing by way of socks or hose,

18        anything?

19  A.   Socks, but not thick socks, very thin socks.

20  Q.   Do you know what the weather was on the night

21        of this accident?

22  A.   I don't remember.

23  Q.   So, as I understand what you've told me, you

24        have no explanation for why your right foot

82

1     got stuck on this escalator; correct?

2    A.   Correct.

3    Q.   You don't know if the escalator malfunctioned;

4    correct?

5    A.   Correct.

6    Q.   You don't know if it was a design problem on

7    this escalator; correct?

8    A.   Correct.

9    Q.   You felt nor heard nothing unusual; correct?

10    A.   Correct.

11    Q.   Why are you suing the FleetCenter then if you

12    don't know what caused your right foot to get

13    stuck?

14            MS. MORELLO:  Objection.

15    A.   Can you ask that again?

16    Q.   Yes.  Why are you suing the FleetCenter if you

17    don't know why your right foot got stuck on

18    the escalator?

19    A.   I don't --

20            MS. MORELLO:  I'm going to object and

21    instruct her not to answer.  I mean, she's not

22    a lawyer and doesn't know the law, and we're

23    certainly not going to talk about any

24    discussions between attorney/client.

83

1          MR. BOYLE:  I'm not asking her any

2     attorney/client.  I will suspend the

3     deposition if you're instructing her not to

4     answer a question about a factual basis of why

5     she's suing the FleetCenter, which I'm

6     absolutely and positively entitled to ask.

7          MS. MORELLO:  Well, we have not had

8     discovery as you know from you.  That's long

9     overdue.  And without discovery and we're

10    still in the process of discovery, number one,

11    and again, she's not a lawyer, and she is not

12    capable of testifying as to the legal basis of

13    any defect or design defect.  We don't have a

14    single document from you.

15         MR. BOYLE:  Understood.  We'll

16    suspend the deposition when I finish my

17    inquiry as to --

18         MS. MORELLO:  Are you going to

19    certify the question?

20 Q.   Do you know of any reason why you fell on that

21    -- strike that.  Do you know anything the

22    FleetCenter did wrong as to cause your foot to

23    get stuck on that escalator?

24         MS. MORELLO:  As of now, do you know.

DEPOSITION OF LISA ROY

84

1    A.    I wouldn't know.

2    Q.    You've gone back to make no investigation at

3          the FleetCenter; correct?

4    A.    Correct.

5    Q.    You don't have any photographs of the

6          escalator; correct?

7    A.    Correct.

8    Q.    You don't know where in the Garden this

9          escalator is located; correct?

10   A.    Correct.

11   Q.    When you were at the bottom of the escalator,

12         was the escalator moving?

13   A.    No.

14   Q.    Do you know how it came to be stopped?

15   A.    One of the employees stopped it.

16   Q.    How do you know that?

17   A.    They told me.

18   Q.    Did you make any observations of your

19         husband's fall?

20   A.    No.

21   Q.    Did you feel him touch you at any time?

22   A.    I don't remember.

23   Q.    Where was he when you first saw him after your

24         fall?

107

COMMONWEALTH OF MASSACHUSETTS
NORFOLK, SS


    I, Mary K. Corcoran, a Notary Public in and for
the Commonwealth of Massachusetts, do hereby
certify there came before me on the 28th day of
November, 2005, the person hereinbefore named was
duly sworn to testify to her knowledge concerning
the matters in controversy in this cause; that she
was thereupon examined upon oath, and that the
deposition is a true record of the testimony given
by the witness.

    I further certify that I am neither attorney
nor counsel for, nor related to or employed by any
of the parties to the action in which this
deposition was taken; and further, that I am not a
relative or employee of any attorney or counsel
employed in this case, nor am I financially
interested in this action.

    IN WITNESS WHEREOF, I have hereunto set my
hand and this 28th day of December, 2005.


                          _Mary K. Corcoran_
                          Mary K. Corcoran
                          Notary Public
                          My commission expires
                          July 5, 2007


PLEASE NOTE:
    THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT
DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY
ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR
DIRECTION OF THE CERTIFYING REPORTER.

**EXHIBIT "4"**

**ORIGINAL**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05CV11095NG
Vol. I, Pg. 1-105

THOMAS ROY and LISA ROY,          )
                                  )
        Plaintiffs,               )
                                  )
        -vs-                      )
                                  )
DELAWARE NORTH COMPANIES, INC.,   )
                                  )
        Defendant                 )

The **DEPOSITION OF THOMAS ROY**, taken on behalf of the Defendant, pursuant to the Massachusetts Rules of Civil Procedure before Mary K. Corcoran, a Professional Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the offices of MORRISON MAHONEY LLP, 250 Summer Street, Boston, MA, on Monday, November 28, 2005, commencing at 1:09 p.m.

**ELLEN M. FRITCH & ASSOCIATES**
**373 Silver Street**
**South Boston, MA 02127**
**(617) 269-5448**

12

| | | |
|---|---|---|
| 1 | | before you arrived at the Fleet? |
| 2 | A. | I would say lunch. |
| 3 | Q. | Did you have anything to eat or drink when you |
| 4 | | went to the Marriott? |
| 5 | A. | No, sir. |
| 6 | Q. | How long did you spend at the Marriott before |
| 7 | | you went to the Fleet? |
| 8 | A. | I can't give you an exact time, but it wasn't |
| 9 | | long.  We basically checked into the room and |
| 10 | | took a taxi over to the FleetCenter. |
| 11 | Q. | How did you get up to the suite; do you know? |
| 12 | A. | It was a combination -- I believe it was an |
| 13 | | elevator. |
| 14 | Q. | Had you had any alcoholic beverages before you |
| 15 | | got to the Fleet that day? |
| 16 | A. | No, sir. |
| 17 | Q. | What's your typical beverage of choice? |
| 18 | A. | All I drink is beer. |
| 19 | Q. | Approximately how many beers do you have a day |
| 20 | | on average? |
| 21 | A. | No more than three or four. |
| 22 | Q. | Have you ever been treated for any substance |
| 23 | | abuse involving alcohol or drugs? |
| 24 | A. | No, sir. |

16

| | | |
|---|---|---|
| 1 | A. | Yes, sir. |
| 2 | Q. | Any names that you can recall? |
| 3 | A. | No.  I was just familiar with them, like being |
| 4 | | on my job sites. |
| 5 | Q. | Was this all adults in the box in the suite? |
| 6 | A. | Correct. |
| 7 | Q. | And mostly couples? |
| 8 | A. | There was some couples, and there was I |
| 9 | | believe the guys from Lamere was four men that |
| 10 | | came from that company. |
| 11 | Q. | And what was the average age of the group in |
| 12 | | the suite? |
| 13 | A. | Between 35 and 45. |
| 14 | Q. | Was there any -- strike that.  Was liquor |
| 15 | | available in the suite? |
| 16 | A. | Yes, sir. |
| 17 | Q. | What was available? |
| 18 | A. | Beer and wine. |
| 19 | Q. | Was it self-service? |
| 20 | A. | Yes. |
| 21 | Q. | Did you have to pay for it? |
| 22 | A. | No, sir. |
| 23 | Q. | This was something that was provided by the |
| 24 | | owner or owners of the suite and you were a |

DEPOSITION OF THOMAS ROY

17

```
1         guest; correct?

2    A.   Correct.

3    Q.   Just help yourself to the beer in the

4         refrigerator?

5    A.   Correct.

6    Q.   And did you consume any liquor other than the

7         beer that you drank in the suite?

8    A.   No, sir.

9    Q.   How about your wife?

10   A.   My wife doesn't drink beer.  She's very fussy

11        on wine, and she didn't like the wine they had

12        in there, so I was getting her a couple of rum

13        and Cokes out in the hallway.  I had to leave

14        the suite to do that.

15   Q.   How did you know where to go?

16   A.   I don't remember.

17   Q.   And where did you get rum and Cokes for your

18        wife?

19   A.   On the same level as the suite in a concession

20        stand.

21   Q.   Is the concession stand in the corridor?

22   A.   I believe so, what I can remember.

23   Q.   Is there a bar located at one end of the

24        premium level, formal bar?
```

18

| | | |
|---|---|---|
| 1 | A. | What I can remember is there's more than one. |
| 2 | | There's different locations where you can get |
| 3 | | imported beers.  You can get wine.  You can |
| 4 | | get -- and there was an area where I could get |
| 5 | | her a rum and Coke. |
| 6 | Q. | Are you talking about going down a level to |
| 7 | | the loge area to do this? |
| 8 | A. | I believe it was the same level as the suite |
| 9 | | that I can remember. |
| 10 | Q. | Do you know what number suite this was? |
| 11 | A. | No, sir. |
| 12 | Q. | Do you know the location relative to where the |
| 13 | | Celtics' bench was or the Visitors' bench? |
| 14 | A. | If we're facing the court right now, and |
| 15 | | that's the court, over down towards this side |
| 16 | | of the basket, the left basket (indicating). |
| 17 | Q. | I'm showing you this diagram, which has been |
| 18 | | previously marked as Exhibit 1 at your wife's |
| 19 | | deposition, and you see Celtics, Visitors, |
| 20 | | does that help you with respect to where this |
| 21 | | suite was located? |
| 22 | A. | I don't know where these numbers mean, but we |
| 23 | | were high and low were in this area here |
| 24 | | (indicating). |

DEPOSITION OF THOMAS ROY

19

1    Q.    I believe that the small numbers represent the

2          suites and the big numbers represent the upper

3          balcony.

4    A.    Okay.

5    Q.    So, are we talking about --

6    A.    My guess would be right here (indicating).

7    Q.    113?

8    A.    That's my guess.

9    Q.    And do you know where -- strike that -- where

10         this concession stand where you say you bought

11         the rum and Coke was located?

12   A.    No, sir.  I had to leave the suite.  All I can

13         remember is I didn't have to go down any

14         stairs or anything.

15   Q.    Did they have any waitress service into the

16         suite providing the delivery of alcoholic

17         beverages to your knowledge?

18   A.    Just beer and wine.

19   Q.    That's always there?

20   A.    Yes.

21   Q.    Or someone brings it in and leaves it there;

22         you're not served by a waiter or a waitress or

23         anything?

24   A.    No.

20

1    Q.    And did you consume beer in that suite that

2          night?

3    A.    Yes, sir.

4    Q.    How many beers did you consume?

5    A.    I was guessing four or five.

6    Q.    And how many rum and Cokes did your wife have?

7    A.    I believe two.

8    Q.    Is that a guesstimate?

9    A.    No.  I'd say two.

10   Q.    Did she buy any rum and Cokes for herself?

11   A.    No, sir.

12   Q.    Did you feel the effect of the beers?

13   A.    No, sir.

14   Q.    When did you drink the beers?

15   A.    During the game.

16   Q.    Was it spread out evenly during the game?

17   A.    Yes, sir.

18   Q.    What time did you get to the game relative to

19         tip-off?

20   A.    I don't remember.  It was before the game.

21   Q.    And how long did you spend at the suite after

22         the game ended?

23   A.    Maybe ten minutes.

24   Q.    How were you dressed?

DEPOSITION OF THOMAS ROY

21

|     |     |                                                      |
| --- | --- | ---------------------------------------------------- |
| 1   | A.  | I don't remember.                                    |
| 2   | Q.  | Casual clothes?                                      |
| 3   | A.  | Dress clothes.                                       |
| 4   | Q.  | Did you have a -- what kind of dress clothes          |
| 5   |     | like a suit?                                          |
| 6   | A.  | Not a suit coat and tie.  I had regular dress          |
| 7   |     | pants, a shirt and tie, and a Polo sweater.          |
| 8   | Q.  | An overcoat?                                           |
| 9   | A.  | No, sir, I didn't wear coats.                         |
| 10  | Q.  | What size -- well, strike that.  Were these           |
| 11  |     | twelve-ounce cans of beer?                            |
| 12  | A.  | Yes, sir.                                             |
| 13  | Q.  | And did you sit in any of the seats in the           |
| 14  |     | suite during the night?                               |
| 15  | A.  | Off and on.                                           |
| 16  | Q.  | And off and on did you just stand and                 |
| 17  |     | socialize?                                             |
| 18  | A.  | Correct.                                              |
| 19  | Q.  | Just pretty much everybody enjoying a social          |
| 20  |     | beverage, alcoholic beverage in that suite?          |
| 21  | A.  | I don't remember who was drinking what.  I            |
| 22  |     | didn't pay attention to that.                        |
| 23  | Q.  | Were there also soft drinks available?               |
| 24  | A.  | Yes, sir.                                             |

DEPOSITION OF THOMAS ROY

22

1   Q.   Did you have anything other than beer to

2        drink?

3   A.   No, sir.

4   Q.   Did you have any other food other than the

5        chowder?

6   A.   I had shrimp, and I had a sandwich.

7   Q.   What kind of sandwich?

8   A.   It was an assorted sandwich platter.  I love

9        ham, so I would make an assumption that it was

10       ham.

11  Q.   Was it a full sandwich or just cut and quarter

12       type sandwiches?

13  A.   They make the large grinders, and they cut

14       them in sections.

15  Q.   So, this was part of a grinder or something

16       that was cut in sections?

17  A.   Yes.

18  Q.   The whole thing was ham?

19  A.   They had lettuce and tomato and veggies and

20       stuff like that.

21  Q.   Any other sandwiches available?

22  A.   Yes, there was different varieties.

23  Q.   In addition to the big submarine sandwich type

24       of?

DEPOSITION OF THOMAS ROY

23

| | | |
|---|---|---|
| 1 | A. | Yes. |
| 2 | Q. | What other sandwiches were available? |
| 3 | A. | They had turkey.  They had roast beef. |
| 4 | Q. | About how many people were in the suite? |
| 5 | A. | This is a guess, but I'd say twelve. |
| 6 | Q. | Did you ever feel that you were intoxicated? |
| 7 | A. | No, sir. |
| 8 | Q. | Did you ever remember having any trouble |
| 9 | | walking? |
| 10 | A. | No, sir. |
| 11 | Q. | Did you notice anything about your wife's |
| 12 | | appearance that suggested to you that she was |
| 13 | | intoxicated? |
| 14 | A. | Absolutely not. |
| 15 | Q. | Was there anything about her that suggested to |
| 16 | | you that she was under the influence of |
| 17 | | alcohol? |
| 18 | A. | No, sir. |
| 19 | Q. | Did you see her walk? |
| 20 | A. | Yes, sir. |
| 21 | Q. | How did she walk? |
| 22 | A. | Normal. |
| 23 | Q. | Did you hear her talk? |
| 24 | A. | Yes, sir. |

35

1   who was going down first?

2 A. My wife was going first.

3 Q. Any reason for that?

4 A. I always let her go first.

5 Q. Was there room for both of you on the

6   escalator going side by side?

7 A. No.

8 Q. And how long was she on the escalator before

9   something happened?

10 A. A few seconds.

11 Q. What did you see as she approached the

12   escalator in front of you?

13 A. I saw her lose her balance, and I went to grab

14   her, and that's all I remember.

15 Q. Were you on the escalator when you saw her

16   lose her balance?

17 A. I don't remember.

18 Q. Did you fall down the escalator?

19 A. I was told I did after.

20 Q. What's your last memory?

21 A. My wife losing her balance.

22 Q. Describe what you saw when you say she lost

23   her balance; what body movement did you

24   observe?

DEPOSITION OF THOMAS ROY

36

| | | |
|---|---|---|
| 1 | A. | I could tell she was having problems. |
| 2 | Q. | Was she holding onto the railing? |
| 3 | A. | I don't remember. |
| 4 | Q. | Were you holding onto the railing? |
| 5 | A. | I don't remember. |
| 6 | Q. | Do you know why she was having problems? |
| 7 | A. | I was told that she got her heel caught. |
| 8 | Q. | Did you observe anything by way of seeing her |
| 9 | | foot on the escalator? |
| 10 | A. | No, sir. |
| 11 | Q. | Which way did you see her move? |
| 12 | A. | That I can remember was her body just went to |
| 13 | | jerk, and I just knew she was going to fall. |
| 14 | Q. | Her body began to jerk which way? |
| 15 | A. | It started to fall towards falling down the |
| 16 | | escalator. |
| 17 | Q. | Did she stumble right or stumble left? |
| 18 | A. | I don't remember. |
| 19 | Q. | Did you see where her purse was? |
| 20 | A. | No, sir. |
| 21 | Q. | Did you see where her jacket was? |
| 22 | A. | No, sir. |
| 23 | Q. | Do you remember how she was dressed? |
| 24 | A. | No, sir. |

DEPOSITION OF THOMAS ROY

37

1   Q.   Did you hear anything unusual before she fell?

2   A.   No, sir.

3   Q.   Did you observe any commotions -- talking

4        about the escalator -- anything unusual about

5        the appearance of the escalator before she

6        fell?

7   A.   No, sir.

8   Q.   When you approached the elevator, did it

9        appear to be operating in a normal fashion?

10   A.   When we arrived at the game, it was working.

11   Q.   Well, did you take the same escalator up the

12        stairs?

13   A.   I don't remember.

14   Q.   As you approached the escalator at 10:30 to go

15        down the escalator, did you observe anything

16        about its movement that looked unusual to you?

17   A.   I wasn't paying any attention to it.

18   Q.   Nothing out of the ordinary that caught your

19        eye?

20   A.   No, sir.

21   Q.   Did you see any Fleet employees in the area at

22        the top of the escalator?

23   A.   No, sir.

24   Q.   Do you remember someone saying you can't take

42

1      you what caused your wife to lose her balance

2      by way of your own observations?

3   A.  No, sir.

4   Q.  Now, were you involved in your job with

5      inspecting machinery that is going to be used

6      in any of your commercial buildings?

7   A.  No, sir.

8   Q.  Who would do that?

9   A.  The contractor who installed the equipment.

10  Q.  Do you ever go out and inspect jobs?

11  A.  Jobs that I run, yes.

12  Q.  Who told you after the accident that your wife

13     caught her foot?

14  A.  Someone at the hospital.

15  Q.  Obviously, they weren't at the garden --

16     strike that.  They weren't at the FleetCenter

17     to witness what happened; correct?

18  A.  No, sir.

19  Q.  Now, in your Answer to Interrogatory Number 5,

20     you say it is my opinion that the elevator had

21     defects that caused Lisa to catch her heel --

22     strike that.

23         It is my opinion that the escalator had

24     defects that caused Lisa to have her heel

DEPOSITION OF THOMAS ROY

43

1    catch in the tread.  Why is that your opinion?

2  A.  Because that's what I was told.

3  Q.  Told by whom?

4  A.  My wife.

5  Q.  And what defects do you say were in the

6    escalator?

7         MS. MORELLO:  Objection.  You can

8    answer.

9  A.  I don't know.

10  Q.  Well, did you ask your wife?

11  A.  No, sir.

12  Q.  You've been a contractor for 28 years.  You

13    have no idea what defect was in an escalator

14    you say caused your wife to fall down the

15    stairs; right?

16         MS. MORELLO:  Objection.  You can

17    answer.

18  A.  I never installed an escalator.

19  Q.  No, but you've never even been curious to find

20    out what the defect was?

21         MS. MORELLO:  Objection.

22  A.  No, sir.

23  Q.  So, what I'm understanding here from you, sir,

24    is that your opinion is solely based on what

44

| | | |
|---|---|---|
| 1 | | your wife told you? |
| 2 | A. | Correct. |
| 3 | Q. | And she didn't tell you what the defect was? |
| 4 | A. | No, sir. |
| 5 | Q. | So, when you say the word escalator had |
| 6 | | defects plural, are you aware of any plural |
| 7 | | defects, more than one? |
| 8 | A. | I'm not aware of any of them. |
| 9 | Q. | So, whether they had one or two or zero, you |
| 10 | | have no idea? |
| 11 | A. | Correct. |
| 12 | Q. | Could she have just lost her balance and |
| 13 | | fallen down the stairs? |
| 14 | A. | No, sir. |
| 15 | Q. | Why could that not have been a cause of the |
| 16 | | fall? |
| 17 | A. | Because I believe everything she tells me. |
| 18 | Q. | Well, you weren't watching her feet; were you? |
| 19 | A. | No. |
| 20 | Q. | You can't remember if she was holding onto the |
| 21 | | railing? |
| 22 | A. | No, sir. |
| 23 | Q. | You can't remember what foot she first put on |
| 24 | | the escalator? |

DEPOSITION OF THOMAS ROY

105

COMMONWEALTH OF MASSACHUSETTS
NORFOLK, SS

    I, Mary K. Corcoran, a Notary Public in and for the Commonwealth of Massachusetts, do hereby certify there came before me on the 28th day of November, 2005, the person hereinbefore named was duly sworn to testify to his knowledge concerning the matters in controversy in this cause; that he was thereupon examined upon oath, and that the deposition is a true record of the testimony given by the witness.

    I further certify that I am neither attorney nor counsel for, nor related to or employed by any of the parties to the action in which this deposition was taken; and further, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in this action.

    IN WITNESS WHEREOF, I have hereunto set my hand and this 31st day of December, 2005.

Mary K. Corcoran
Notary Public
My commission expires
July 5, 2007

PLEASE NOTE:
    THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR DIRECTION OF THE CERTIFYING REPORTER.

DEPOSITION OF THOMAS ROY

**EXHIBIT "5"**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 05CV11095NG

THOMAS ROY and              )
LISA ROY                    )
                            )
     vs.                    )
                            )
DELAWARE NORTH COMPANIES,   )          Volume I
INC. - BOSTON               )          Pages 1-49


DEPOSITION OF SHEMA TAYLOR, taken on

behalf of the Defendant, pursuant to the

applicable provisions of the Massachusetts Rules

of Civil Procedure, before Diane M. Tully,

Certified Shorthand Reporter and Notary Public

in and for the Commonwealth of Massachusetts,

taken at the offices of Morrison Mahoney, LLP,

250 Summer Street, Boston, Massachusetts 02210,

on Friday, February 17, 2006, commencing at

2:02 p.m.


ELLEN M. FRITCH & ASSOCIATES
373 SILVER STREET
SOUTH BOSTON, MASSACHUSETTS 02127
(617)269-5448



7

1    company before the date of March 10th, 2004?

2        A.    Since the end of October of 2003.

3        Q.    So about -- talking about six months or

4    so?

5        A.    Yeah, right.

6        Q.    Do you know -- do you recall what the

7    event was that night?

8        A.    I believe it was a Bruins game.  I'm not

9    exactly sure but it was a sporting -- it was

10   between Boston Celtics or the Boston Bruins.

11       Q.    Okay.  And at about ten o'clock or so

12   do you recall where you were assigned your duty

13   station?

14       A.    Yeah, to stand at the bottom of the

15   premium escalator.

16       Q.    How long had you been stationed at that

17   location?

18       A.    I would say about 20 minutes.

19       Q.    And did something unusual happen at about

20   ten o'clock that night?

21       A.    Right, that's when I witnessed the couple

22   tumbling down the escalator.

23       Q.    And do you remember what time the Celtics

24   game started?

10

1    restaurants, too?

2        A.    Right.

3        Q.    And do those people tend to stay at

4    the Garden a little longer after the games

5    than --

6        A.    I believe it's a half hour after the game.

7        Q.    Okay.  And during the 20 minutes that you

8    were standing at the bottom of that escalator, did

9    you ever notice anything unusual about the way the

10   escalator was operating?

11       A.    No, it was operating fine.

12       Q.    And did you see people coming down that

13   escalator?

14       A.    Yeah, there was a number of them that was

15   coming down that escalator.

16       Q.    Did you see anybody fall during that 20

17   minutes?

18       A.    No.

19       Q.    And --

20       A.    Well, I mean, once -- no, before, you

21   know, the couple fell down the escalator there was

22   no other issues before that.

23       Q.    Right.  Do you remember where you were

24   stationed during the game?

15

1    Q.   You said at about ten o'clock or so, which

2    was some 20 minutes after the athletic event

3    ended, you were at the bottom of this escalator,

4    correct?

5    A.   Right.  Well, in the vicinity of the

6    escalator.

7    Q.   Right.  And at about that time you noticed

8    something unusual happening on the escalator?

9    A.   Right.  Well, I heard something.  I

10   mean. . .

11   Q.   What did you hear?

12   A.   I heard, you know, a loud banging noise.

13   Q.   Then what happened?

14   A.   Then I turned and then that's when the,

15   you know, the couple was falling down the

16   escalator.

17   Q.   Did you see that?

18   A.   Yes.

19   Q.   What did you see?

20   A.   Them from just about the top of the

21   escalator until the bottom, I just witnessed them

22   falling down the escalator.

23   Q.   Was it a man and a woman?

24   A.   A man and a woman, right.

CONDENSED

16

1    Q.    Do you know approximately how old they

2    were?

3    A.    I would say they looked in their 50's.

4    Q.    Do you know how they were dressed?

5    A.    Pretty casual, comfortable.

6    Q.    Did you see whether or not they were

7    carrying anything in their hands as they were

8    falling?

9    A.    I don't remember if they were carrying

10    anything.

11    Q.    And at the time they were falling did you

12    notice anything unusual about the way the

13    escalator was moving?

14    A.    The escalator was just moving how it would

15    normally operate.  They were going, you know,

16    until the emergency button was pushed.

17    Q.    Could you describe how they were falling,

18    sort of the motions they were --

19    A.    They were just, kind of just tumbling.

20    Their bodies was going around and around

21    (indicating) as they were going down the

22    escalator.

23    Q.    Were they sort of entangled with each

24    other?

49

COMMONWEALTH OF MASSACHUSETTS   )
COUNTY OF SUFFOLK, SS.          )


        I, DIANE M. TULLY, Certified Shorthand
Reporter and Notary Public duly commissioned and
qualified in and for the Commonwealth of
Massachusetts, do hereby certify that there came
before me on Friday, February 17, 2006 at
2:02 p.m., the person hereinbefore named, who was
by me duly sworn to testify to the truth and
nothing but the truth of her knowledge touching
and concerning the matters in controversy in this
cause; that she was thereupon examined upon her
oath, and her examination reduced to typewriting
under my direction; and that the deposition is a
true record of the testimony given by the witness.

        I further certify that I am neither
attorney nor counsel for, nor related to or
employed by, any of the parties to the action in
which this deposition is taken; and further that I
am not a relative or employee of any attorney or
counsel employed by the parties hereto or
financially interested in the action.

        IN WITNESS WHEREOF, I have hereunto set
my hand and affixed my seal this twenty-eighth day
of February, 2006.




        _____
        DIANE M. TULLY, Notary Public
        My Commission Expires:
        September 6, 2007

**EXHIBIT "6"**



**Office of the General Counsel**
Litigation Management

January 18, 2006

**KONE Inc.**
One KONE Court
Moline, IL 61265

Mr. Roger Allcroft
Morrison Mahoney, LLP
250 Summer Street
Boston, MA 02210-1181

Tel 309 743-5367
Fax 309 743-5266
lori.robertson@kone.com

Re:  Thomas & Lisa Roy vs. Delaware North Companies
     Our File No.:  2005-00262

Dear Mr. Allcroft:

Referencing your subpoena relating to the subject matter KONE Inc. responds as follows:

1.  "Any and all maintenance records along with all documentation pertaining to the escalator at
    the TD Banknorth Garden located between level 5 and level 5 (Loge 4) for the period of
    March 10, 2002 to March 10, 2005."

      **Response:**   **KONE Inc. objects to the subpoena on the grounds that it is overly broad,
unduly burdensome and not calculated to lead to the discovery of admissible
evidence.  Without waiving same objection, please see attached copies of the
time tickets and phone logs regarding the escalator in question for a time
period of 3/10/02 through 3/10/05.**

If you have any questions, please feel free to call.

Very truly yours,

Lori Robertson
Litigation Associate

# Time Ticket Image



| Service Order | 1534902 Y01 Customer Call |
|---|---|
| Date and Time | 03/11/04 *arrive:* 08:26 *leave:* 09:02 |
| Building Site | FLEET CTR<br>1 FLEET CTR WAY<br>BOSTON MA 02110 |
| Employee | 10160032 - Kobs Jr, William - Foreman |
| Contract Number | 40010767 |

CHECK FORM TYPE
☐ CUSTOMER RECEIPT   ☐ REPAIR REQUEST
☒ WORK DESCRIPTION   ☐ MATERIAL REQUEST

KONE

DATE 3/11/04   EMP# 032   BR# 160

SRVC ORDER # 1534902

BLDG Fleet Center

UNIT ID

HRS:MIN ST 1   T5   T7   DT

BILL STATUS ☐ NO   ☐ SPLIT   ☒ 100%

Checked Accident
Incident — Fred
Mc Mahon —
Notified State

CUSTOMER SIGNATURE *[signature]*

Customer Notice: Please verify hours are correctly stated. Labor, material and expense charges are portal to portal. Our examiner serviced your elevators or escalators as shown. In the event you experience or have reported to you any problems with the elevators or escalators, notify our local office immediately.

41135550

WF-SEB-0756 (10/02)
PAYROLL COPY

# Time Ticket Detail Report



| | |
|---|---|
| **Service Order** | 1487968 Y01 Customer Call |
| **Date and Time** | 01/28/04 *arrive:* 20:06 *leave:* 21:10 |
| **Callout Category** | Equipment Shut Down |
| **Customer Request** | NOT WORKING |
| **Caller Name** | JANIAN |
| **Description of Work** | Technical;Repair Handrail drive shaft |
| **Contract Number** | 40010767 |
| **Building Site** | 5016311<br>FLEET CTR<br>1 FLEET CTR WAY<br>BOSTON MA 02110 |
| **Employee** | 10160368 - Collins, Kevin - Mechanic |
| **Billing Status** | None |
| **Company Vehicle Miles** | 0 |
| **Regular Hours** | 0.00 |
| **Overtime Hours** | 1.00 |
| **Travel Hours** | 0.00 |
| **Overtime Travel Hours** | 1.00 |

## Equipment

| Number | Manufacturer | Type | Lift ID |
|---|---|---|---|
| 20028620 | MONTGOMERY | Escalator | ESC #11 |

## The image for this time ticket has not been digitized

**EXHIBIT "7"**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05 11095 NG

| | |
|---|---|
| THOMAS ROY and LISA ROY, Plaintiffs, | ) ) ) |
| v. | ) ) |
| DELAWARE NORTH COMPANIES, INC. - BOSTON, Defendant. | ) ) ) ) |

### AFFIDAVIT OF JASON BECKETT

I, Jason Beckett, upon my oath do aver as follows:

1. I am employed by Delaware North Companies, Inc. - Boston ("Delaware North"), and I am the Director of Operations at the TD Banknorth Garden ("Garden"), formerly known as the Fleet Center, located at 100 Legends Way, Boston, MA 02114. I have held that position since October, 2000.

2. I had oversight responsibilities at the Garden, which included operation of the escalators at events, at all times material hereto, including March 10, 2004.

3. Before the alleged incident of March 10, 2004, there had been no report to Delaware North of any malfunction involving the Premium Level escalator located between Level 5 and Loge 4 (Section 4), or any report of a dangerous condition on or about the subject escalator, which the plaintiffs claim malfunctioned.

4. Following the alleged incident of March 10, 2004, there was no report to Delaware North of any malfunction involving the subject escalator.

1179452v1

5.    The subject escalator is maintained by KONE Inc. ("KONE"), an independent contractor hired by the Garden and specializing in escalator maintenance. KONE is located at One KONE Court, Moline, IL 61265.

6.    KONE serviced the subject escalator on January 28, 2004 and reported that the escalator was functioning properly. (See Exhibit A).

7.    KONE conducted a routine inspection of the subject escalator on March 11, 2004, immediately following the alleged incident on March 10, 2004, and reported that the escalator had no problems and was working properly. (See Exhibit A).

8.    Delaware North never received any notice of any problems or malfunctions involving the subject escalator before or after the alleged incident on March 10, 2004.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS
3 DAY OF ___August___, 2006.

Jason Beckett
Director of Operations
TD Banknorth Garden

1179432v1

**EXHIBIT "A"**



**Office of the General Counsel**
Litigation Management

January 18, 2006

**KONE Inc.**
One KONE Court
Moline, IL 61265

Mr. Roger Allcroft
Morrison Mahoney, LLP
250 Summer Street
Boston, MA 02210-1181

Tel 309 743-5367
Fax 309 743-5266
lori.robertson@kone.com

Re: Thomas & Lisa Roy vs. Delaware North Companies
    Our File No.: 2005-00262

Dear Mr. Allcroft:

Referencing your subpoena relating to the subject matter KONE Inc. responds as follows:

1.  "Any and all maintenance records along with all documentation pertaining to the escalator at
    the TD Banknorth Garden located between level 5 and level 5 (Loge 4) for the period of
    March 10, 2002 to March 10, 2005."

    **Response:**   **KONE Inc. objects to the subpoena on the grounds that it is overly broad,
    unduly burdensome and not calculated to lead to the discovery of admissible
    evidence. Without waiving same objection, please see attached copies of the
    time tickets and phone logs regarding the escalator in question for a time
    period of 3/10/02 through 3/10/05.**

If you have any questions, please feel free to call.

Very truly yours,

Lori Robertson
Litigation Associate

## Time Ticket Image



| | |
|---|---|
| **Service Order** | 1534902 Y01 Customer Call |
| **Date and Time** | 03/11/04 *arrive:* 08:26 *leave:* 09:02 |
| **Building Site** | FLEET CTR<br>1 FLEET CTR WAY<br>BOSTON MA 02110 |
| **Employee** | 10160032 - Kobs Jr, William - Foreman |
| **Contract Number** | 40010767 |

CHECK FORM TYPE
☐ CUSTOMER RECEIPT    ☐ REPAIR REQUEST
☒ WORK DESCRIPTION    ☐ MATERIAL REQUEST

KONE

DATE 3/11/04  EMP# 032  BR# 160
SRVC ORDER # 1534902
BLDG Fleet Center
UNIT ID
HRS:MIN ST 1  T5  T7  DT
BILL STATUS ☐ NO  ☐ SPLIT  ☒ 100%

Checked Accident
Incident — Fuel
McFarland —
Notified State

CUSTOMER SIGNATURE
Customer Notice: Please verify hours are correctly stated. Labor, material and expense charges are portal to portal. Our examiner serviced your elevators or escalators as shown. In the event you experience or have reported to you any problems with the elevators or escalators, notify our local office immediately.

41135550

WF-SEB-0756 (10/02)
PAYROLL COPY

# Time Ticket Detail Report



| | |
|---|---|
| **Service Order** | 1487968 Y01 Customer Call |
| **Date and Time** | 01/28/04 *arrive:* 20:06 *leave:* 21:10 |
| **Callout Category** | Equipment Shut Down |
| **Customer Request** | NOT WORKING |
| **Caller Name** | JANIAN |
| **Description of Work** | Technical;Repair Handrail drive shaft |
| **Contract Number** | 40010767 |
| **Building Site** | 5016311<br>FLEET CTR<br>1 FLEET CTR WAY<br>BOSTON MA 02110 |
| **Employee** | 10160368 - Collins, Kevin - Mechanic |
| **Billing Status** | None |
| **Company Vehicle Miles** | 0 |
| **Regular Hours** | 0.00 |
| **Overtime Hours** | 1.00 |
| **Travel Hours** | 0.00 |
| **Overtime Travel Hours** | 1.00 |

## Equipment

| Number | Manufacturer | Type | Lift ID |
|---|---|---|---|
| 20028620 | MONTGOMERY | Escalator | ESC #11 |

# The image for this time ticket has not been digitized

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05 11095 NG

THOMAS ROY and LISA ROY,               )
          Plaintiffs,               )
                            )
v.                                     )
                            )
DELAWARE NORTH COMPANIES, INC.   )
- BOSTON,                              )
            Defendant.               )
                            )

## DEFENDANT, DELAWARE NORTH COMPANIES, INC. - BOSTON'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**I.**    **INTRODUCTION**

This is a diversity action sounding in tort in which the plaintiff, Thomas Roy, allegedly suffered injuries after falling down an escalator at the Fleet Center, owned and operated by Delaware North Companies, Inc. – Boston ("Delaware North"). As a result of the alleged injuries suffered by Mr. Roy, his wife, Lisa Roy, has alleged loss of her husband's consortium.

In Count I of the Complaint, the plaintiffs allege that due to the negligence of the defendant "in the maintenance and/or operation of said escalator," the plaintiffs were caused to fall and suffer damages.[1] Further, in Mr. Roy's Answer to Interrogatory No. 5, he alleges that the subject escalator had "defects" which caused Ms. Roy's heel to catch in the escalator threads.[2]

---

[1] See Complaint, attached hereto as Exhibit 1.
[2] See Plaintiff, Thomas Roy's Answers to Interrogatories, attached hereto as Exhibit 2.

Delaware North is entitled to summary judgment because the plaintiffs have failed to proffer evidence of an escalator defect, or that Delaware North knew or should have known of any dangerous condition.

## II.    FACTS

On March 10, 2004, the plaintiffs, Lisa Roy (age 44) and Thomas Roy (age 49), attended a Boston Celtics game in a luxury suite at the Fleet Center. *Plaintiff, Lisa Roy's Deposition* at *22-27.*[3] The game started between 7:00 and 7:30 p.m. *Id.* Before the game, the plaintiffs drove to Boston from their home in Hooksett, N.H. *Id.* After the game, they had planned to spend the night at the Copley Plaza Marriott in Boston, MA. *Id.* Both plaintiffs deny drinking alcohol before the game. *Id.*; *Plaintiff, Thomas Roy's Deposition* at *12.*[4]

While in the luxury suite, the plaintiffs ate chowder, shrimp, and sandwiches while socializing with other guests. *Exhibit 4 at 16-22.* The luxury suite had a "self-service" refrigerator which provided beer and wine for guests. *Id.* During the game, Mr. Roy served himself four to five beers that were provided by the luxury suite owner. *Id.* Ms. Roy drank three "rum and cokes" that were purchased from a vendor outside the suite. *Exhibit 3 at 44-46.* Both plaintiffs denied they were intoxicated. *Exhibit 3 at 51*; *Exhibit 4 at 23.* Mr. Roy stated the following at his deposition:

Q:    Did you ever feel that you were intoxicated? *Exhibit 4 at 23.*

A:    No, sir. *Id.*

Ms. Roy stated the following at her deposition:

---

[3] Relevant pages of Ms. Roy's deposition transcript are attached hereto as Exhibit 3.
[4] Relevant pages of Mr. Roy's deposition transcript are attached hereto as Exhibit 4.

1184314v1

Q:     When you left the Booth [luxury suite], do you feel that you were under the influence of alcohol? *Exhibit 3 at 51*.

MS. MORELLO:        Objection. *Id.*

A:     No. *Id.*

Approximately twenty minutes after the game, the plaintiffs attempted to exit the Premium Level by descending the subject escalator. *Shema Taylor's Deposition at 15*.[5]  Ms. Roy claimed that she lost her footing while descending the escalator which caused her to fall, but could not identify any defect. *Exhibit 3 at 81-82*.  Ms. Roy stated the following at her deposition:

Q:     How did the accident happen? *Id. at 61*.

A:     My heel got caught when I stepped onto the escalator. *Id. at 62*.

Q:     Got caught on what? *Id.*

A:     I wasn't looking down.  I believe the treads. *Id.*

Q:     Well, how do you know it was the treads? *Id.*

A:     I don't know.  I wasn't looking down. *Id.*

Q:     Did you notice anything unusual about the appearance of the treads on the escalator? *Id.*

---

[5] Relevant pages of Ms. Taylor's deposition transcript and photograph of subject escalator are attached hereto as Exhibit 5.

A:     No. *Id.*

Q:     You say catch on something.   You don't know what part of your shoe caught on
       what part of the escalator; correct?  *Id. at 71.*

A:     Correct.  *Id.*

Q:     You don't know if it was the toe, the heel, the side of the shoe; you just feel your
       shoe was caught?  *Id.*

A:     Yes.  *Id.*

Q:     You never looked down to see what it was caught on?  *Id.*

A:     No.  *Id.*

Q:     Did you see any foreign substance on the escalator like a banana peel or anything
       like that?  *Id.*

A:     No.  *Id.*

Q:     Any wetness on the escalator?  *Id.*

A:     No.  *Id.*

Q:     Did you feel any sudden unexpected movement on the escalator when you say
       your foot got "caught"?  *Id.*

A:     No.  *Id. at 72.*

Q:     Did you hear any grinding of metal or anything?  *Id.*

A:    No. *Id.*

Q:    So, as I understand what you've told me, you have no explanation for why your right foot got struck on this escalator; correct? *Id. at 81-82.*

A:    Correct. *Id. at 82.*

Q:    You don't know if the escalator malfunctioned; correct? *Id.*

A:    Correct. *Id.*

Q:    You don't know if it was a design problem on this escalator; correct? *Id.*

A:    Correct. *Id.*

Q:    You felt nor heard nothing unusual; correct? *Id.*

A:    Correct. *Id.*

Q:    Do you know of any reason why you fell on that - - strike that. Do you know anything the Fleet Center did wrong as to cause your foot to get stuck on that escalator? *Id. at 83.*

      MS. MORELLO:    As of now, do you know. *Id.*

A:    I wouldn't know. *Id. at 84.*

Mr. Roy did not know what caused his wife to fall, but recalled reaching out to catch her when he noticed that she was losing her balance. *Exhibit 4 at 35-36.* Mr. Roy does not

remember anything after reaching for his wife, including the fall. _Id._  Mr. Roy testified as follows:

Q:    As you approached the escalator at 10:30 to go down the escalator, did you observe anything about its movement that looked unusual to you? _Id. at 37._

A:    I wasn't paying any attention to it. _Id._

Q:    Nothing out of the ordinary that caught your eye? _Id._

A:    No, sir. _Id._

Q:    Now, in your Answer to Interrogatory Number 5, you say it is my opinion that the elevator [sic] had defects that caused Lisa to catch her heel - - strike that.  It is my opinion that the escalator had defects that caused Lisa to have her heel catch in the tread.  Why is that your opinion? _Id. at 42- 43._

A:    Because that's what I was told. _Id. at 43._

Q:    Told by whom? _Id._

A:    My wife. _Id._

Q:    And what defects do you say were in the escalator? _Id._

      MS. MORELLO:    Objection.  You can answer. _Id._

A:    I don't know. _Id._

Q:    Well, did you ask your wife? _Id._

1184314v1

A:    No, sir.  *Id.*

Q:    You've been a contractor for 28 years.  You have no idea what defect was in an escalator you say caused your wife to fall down the stairs; right?  *Id.*

      MS. MORELLO:        Objection.  You can answer.  *Id.*

A:    I never installed an escalator.  *Id.*

Q:    No, but you've never been curious to find out what the defect was?  *Id.*

      MS. MORELLO:        Objection.  *Id.*

A:    No, sir.  *Id.*

Q:    So, what I'm understanding here from you, sir, is that your opinion is solely based on what your wife told you?  *Id. at 43-44.*

A:    Correct.  *Id. at 44.*

Q:    And she didn't tell you what the defect was?  *Id.*

A:    No, sir.  *Id.*

Q:    So, when you say the word escalator had defects plural, are you aware of any plural defects, more than one?  *Id.*

A:    I'm not aware of any of them.  *Id.*

Q:    So, whether they had one or two or zero, you have no idea?  *Id.*

A:    Correct. *Id.*

The facts are uncontroverted that the plaintiffs did not notice any defect in the appearance or operation of the escalator before, during, or after the fall. No evidence exists indicating a malfunction with the escalator, nor have the plaintiffs identified an expert in their answers to interrogatories to offer evidence of a defect. *Exhibit 2.*

Shema Taylor, a security officer on duty at the bottom of the escalator, witnessed the plaintiffs' fall.[6]    *Exhibit 5 at 15.*  She was stationed at the bottom of the escalator for approximately 20 minutes before the incident occurred. *Id. at 7.* She testified as follows:

Q:    You said at about ten o'clock or so, which was some 20 minutes after the athletic
       event ended, you were at the bottom of this escalator, correct? *Id. at 15.*

A.    Right. Well, in the vicinity of the escalator. *Id.*

Q:    Right. And at about that time you noticed something unusual happening on the
       escalator? *Id.*

A:    Right. Well, I heard something. I mean. . . *Id.*

Q:    What did you hear? *Id.*

A:    I heard, you know, a loud banging noise. *Id.*

Q:    Then what happened? *Id.*

---

[6] Ms. Taylor was employed by Security Systems, Inc., and independent contractor hired by the Garden.

1184314v1

A:    Then I turned and then that's when the, you know, the couple was falling down the escalator. *Id.*

Q:    Did you see that? *Id.*

A:    Yes. *Id.*

Q:    What did you see? *Id.*

A:    Them from just about the top of the escalator until the bottom, I just witnessed them falling down the escalator. *Id.*

Q:    Was it a man and a woman? *Id.*

A:    A man and a woman, right. *Id.*

Further, Ms. Taylor testified that she was unaware of any malfunction in the subject escalator. *Id. at 16.* She stated that she was standing in the vicinity of the bottom of the escalator for approximately twenty minutes before the alleged incident. *Id. at 10.* During that time, Ms. Taylor witnessed a number of individuals utilize the escalator without incident. *Id.* Ms. Taylor testified the following regarding the subject escalator's operation at the time of the accident:

Q:    Okay. And during the 20 minutes that you were standing at the bottom of that escalator, did you ever notice anything unusual about the way the escalator was operating? *Id.*

A:    No. It was operating fine. *Id.*

Q:    And did you see people coming down that escalator? *Id.*

A:    Yeah, there was a number of them that was coming down that escalator. *Id.*

Q:    Did you see anybody fall during that 20 minutes? *Id.*

A:    No. *Id.*

KONE Inc., an outside vendor under contract to perform regular escalator maintenance at the Fleet Center, found no problem with the subject escalator after inspecting it on March 11, 2004.[7] According to Jason Beckett, the Director of Operations at the Fleet Center (now called TD Banknorth Garden), Delaware North was not on notice of any problem or malfunction with the escalator before or after the subject incident.[8]

## III.    ARGUMENT

### A.    STANDARD

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Once a moving party has filed a proper summary judgment motion, the burden is on the nonmoving party to present evidence showing existence of a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In the present case, the plaintiffs allege negligence in the maintenance and/or operation of the subject escalator. However, the undisputed facts reveal no evidence of a defect in the subject escalator, or that Delaware North knew or should have known about any allegedly dangerous

---

[7] Relevant pages of the KONE Inc. maintenance records are attached hereto as Exhibit 6.
[8] See Jason Beckett's affidavit, attached hereto as Exhibit 7.

1184314v1

condition before the time of the alleged accident. Further, the plaintiffs have not identified an expert to offer evidence of an escalator defect in design or manufacture. Therefore, Delaware North is entitled to judgment as a matter of law.

### B.    THE PLAINTIFFS CANNOT RECOVER AS THEY HAVE FAILED TO PROFFER EVIDENCE OF AN ESCALATOR DEFECT.

The plaintiff cannot recover in a negligence action where there is no evidence of a defect that caused an accident to happen. In Enrich v. Windmere Corp., 416 Mass. 83 (1993), a homeowner brought suit against an appliance distributor after the homeowner's house was damaged when a "window box fan" caught fire. Id. The Supreme Judicial Court held that the distributor was not liable because the plaintiff failed to proffer evidence that a defect in the fan caused the fire. Id. Further, the Court reasoned that "the presence of such a defect could not be inferred in the absence of expert testimony." Id.

Similarly, in James v. Boston Elevated Railway Co., 201 Mass. 263 (1909), a train passenger brought suit for personal injury against a railway company alleging negligence for operation of an unsafe rail car. Id. at 264. The Supreme Judicial Court held that there was "no evidence of any defect or want of repair in the car" which would warrant a jury to find proof of the facts alleged. Id.

In the present case, the plaintiffs have failed to proffer evidence of a defect in the subject escalator. Further, the plaintiffs have not identified an expert to offer evidence of an escalator defect. As in Enrich and James, where there was no evidence to suggest that a defect caused the accidents, there is no evidence of a premise defect at the Fleet Center. Therefore, this Court should hold, as in Enrich and James, that the plaintiffs' failure to provide even a scintilla of evidence of negligence is fatal to their case.

11

**C.    THE PLAINTIFFS CANNOT RECOVER AS THEY HAVE FAILED TO PROFFER EVIDENCE THAT THE DEFENDANT KNEW OR SHOULD HAVE KNOWN ABOUT THE ALLEGED DEFECT.**

Even assuming arguendo that an escalator defect caused the plaintiffs' fall, the plaintiffs have failed to show that the defendant knew or should have known of any defect prior to the alleged accident.  In the seminal case of Mounsey v. Ellard, 363 Mass. 693 (1973), the Supreme Judicial Court held that landowners are required to exercise "reasonable care in all the circumstances." Id. at 709.  However, a landowner is not strictly liable when a lawful visitor is injured on his/her property.  Id.  Rather, a landlord "should not be liable in negligence unless he knew or reasonably should have known of the defect and had a reasonable opportunity to repair it." Young v. Garwacki, 380 Mass. 162, 170 (1980).

In Leslie v. Glazer, 273 Mass. 221 (1930), the Supreme Judicial Court affirmed the trial court's allowance of the defendant landlord's motion for summary judgment against the plaintiff who allegedly fell down a flight of stairs in a common hallway.  "The burden of proof rested upon the plaintiff to show that, if the stairway was defective, the defendant, in the exercise of reasonable care and diligence, knew or ought to have known of the defect long enough before the plaintiff was injured to have repaired or remedied it." Id. at 223.  The Court held that the plaintiff had failed to prove that the landlord knew or should have known about the alleged defect.  Id.; See also Keeney v. DiCicco, 353 Mass. 773, 774 (1968) (motion for summary judgment appropriate where plaintiff failed to show defendant knew or should have known of defect and had reasonable opportunity to remedy).

In the present case, the plaintiffs have failed to proffer any evidence that the defendant knew or should have known of any dangerous condition on the premises causing the plaintiffs'

1184314v1

fall.  As indicated by all the testimony and evidence, the defendant had no notice of any prior problem with the subject escalator.

## **CONCLUSION**

Summary judgment is appropriate because the plaintiffs have failed to provide any competent evidence of an escalator defect, or that the defendant knew or should have known of any dangerous condition.

WHEREFORE, the defendant moves this Court to enter summary judgment as to all counts against it in the plaintiffs' Complaint.

1184314v1

The Defendant,
DELAWARE NORTH COMPANIES, INC. –
BOSTON,
By its attorney,

_____
Lawrence F. Boyle, BBO# 052680
Roger R. Allcroft, BBO# 663651
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02110
(617) 439-7500

Dated: August 31, 2006

## CERTIFICATE OF SERVICE

I, Roger R. Allcroft, do hereby certify that I have this day served the foregoing **DEFENDANT, DELAWARE NORTH COMPANIES, INC. - BOSTON'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**, to all counsel of record in this action by mailing the same, postage prepaid to:

Joseph G. Abromovitz, Esquire
The Law Office of Joseph G. Abromovitz
858 Washington Street, 3rd Floor
Dedham, MA 02026

Dated: August 31, 2006          By:_____
                                      Roger R. Allcroft

1184314v1